UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KAJAUNA KENYATTA IRVIN,<br><br>        Plaintiff,<br><br>   v.<br><br>JAMES A YATES, et al.,<br><br>        Defendants. | Case No.: 1:10-cv-01940-DAD-SAB (PC)<br><br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>[ECF Nos. 141, 164] |

Plaintiff Kajauna Kenyatta Irvin is appearing pro se in this civil rights action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). The case was removed from state court on October 14, 2010.

Currently before the Court is Defendants' motion for summary judgment, filed May 3, 2016.

## I.

## RELEVANT HISTORY

This action is proceeding on Plaintiff's claims under the First Amendment, RLUIPA, and the Equal Protection Clause.

On December 30, 2014, Defendants D. B. Allen, P. D. Brazelton, E. McBride, D. McGee, W. Myers, K. R. Nash, and James A. Yates filed an answer to the complaint.

On January 5, 2015, the Court issued the discovery and scheduling order.

1

On February 12, 2015, Defendant Bennett filed an answer to the complaint. On February 18, 2015, the Court extended the discovery and scheduling order to Defendant Bennett.

On May 8, 2015, Defendants Farkas, Shimmin, Fisher, Walker, Sobee, Huckabay and Trimble filed an answer to the complaint. On May 13, 2015, the Court extended the discovery and scheduling order to Defendants Farkas, Shimmin, Fisher, Walker, Sobee, Huckabay and Trimble.

On May 2, 2016, Defendants Cate, Davis, and Giurbino filed an answer to the complaint.

As previously stated, on May 3, 2016, Defendants filed a motion for summary judgment. On February 10, 2017, Defendant Guthery joined in Defendants' motion for summary judgment.

Although Plaintiff was granted three extensions of time to file an opposition, no opposition was filed and the deadline to do so expired on January 23, 2017.

On June 21, 2017, the Court denied Plaintiff's motion to stay the proceedings and appointment counsel.

**II.**

**LEGAL STANDARD**

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

In resolving cross-motions for summary judgment, the Court must consider each party's evidence. Johnson v. Poway Unified Sch. Dist., 658 F.3d 954, 960 (9th Cir. 2011). Plaintiff bears the burden of proof at trial, and to prevail on summary judgment, he must affirmatively demonstrate that

no reasonable trier of fact could find other than for him. <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007). Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387 (9th Cir. 2010).

In judging the evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence, <u>Soremekun</u>, 509 F.3d at 984 (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, <u>Comite de Jornaleros de Redondo Beach v. City of Redondo Beach</u>, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted).

In arriving at this recommendation, the Court has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

**III.**

**SUMMARY OF PLAINTIFF'S COMPLAINT**

Plaintiff is a sincere believer in the religion of Islam and actively participates in all religious activities prescribed by Islamic law.

Plaintiff was housed at Pleasant Valley State Prison (PVSP) from January 25, 2006, to January 13, 2011. At the time of his arrival, PVSP had in its employment a full-time Muslim Chaplain named Michael A. Salaam.

In September of 2006, Chaplain Salaam had Plaintiff assigned as the inmate Muslim Clerk. While employed at PVSP, Chaplain Salaam ensured that Plaintiff and other Muslim inmates received weekly chapel access for Ta'leem and Jumu'ah prayer services, as well as appropriated requests to purchase and receive religious artifacts, which he ensured were issued in a reasonably timely fashion; obtained religious significant foods from outside Islamic business for the annual Ramadan and two Id

3

banquets; obtained donations for PVSP's Islamic program; and managed a PVSP trust account with funds allotted by CDCR's religious budget for the benefit of Plaintiff and other Muslim inmates.

While Chaplain Salaam worked at PVSP, Plaintiff and other Muslim inmates had minimal problems receiving adequate religious accommodations.  Indeed, on several occasions Chaplain Salaam had obtained permission from custody supervisory staff to allow Plaintiff and other Facility A Muslim inmates to gather in the chapel for religious services, under custody supervision, during his absences from PVSP.

During Chaplain Salaam's tenure, Plaintiff and other Muslim inmates were allowed to receive chapel access for Ta'leem and Jumu'ah services during program modifications, pursuant to PVSP policy.

On November 12, 2008, Chaplain Salaam submitted PVSP official's written notification of his last day at PVSP on December 5, 2008, to begin working at Avenal State Prison (ASP) on December 8, 2008.

Prior to Chaplain Salaam's job transfer, he obtained written approval from then Facility A supervisory staff on November 14, 2008, to allow Plaintiff and other Muslim inmates to gather in the chapel, under custody staff supervision, on Thursdays for Ta'leem and Fridays for Jumu'ah during the interim of PVSP hiring a replacement Muslim Chaplain.

Soon after Chaplain Salaam's departure, Plaintiff and other Facility A Muslim inmates began experiencing problems from PVSP staff regarding chapel access for scheduled religious services, issues concerning staff refusal to sign and promptly return religious service approval lists, and religious special purchase package forms, staff refusal to retrieve and promptly deliver religious special purchase package forms within a reasonably time, and staff hindrance on religious accommodations for Ramada and two Ids.

///

///

///

///

///

# IV.

## DISCUSSION

### A.     Statement of Undisputed Facts[1]

1.     Plaintiff Kajauna K. Irvin (J-28785) is a state inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR).  (Pl.'s Fourth Am. Compl., ECF No. 50 at 1.)[2]

2.     Plaintiff alleges that Defendants violated his religious rights at Pleasant Valley State Prison (PVSP) from 2009 through 2011.  (Id. at 10-21.)

3.     Plaintiff became an international Orthodox Muslim in 1998.  (Decl. of J. Mathison, Ex. A at AGO.013-015 [Pl. Dep., at 13:19-15:13].)[3]

4.     Plaintiff transferred to PVSP in 2006, and transferred out of PVSP on January 13, 2011 to Salinas Valley State Prison.  (Decl. of J. Mathison, Ex. A at AGO.009 [Pl. Dep., at 23:8-10, 43:1-5].)

5.     During the time period relevant to the fourth amended complaint, PVSP was subject to severe budgetary restrictions due to a statewide financial crisis. (Decl. of W. Myers, ¶¶ 15, 96; see also Decl. of J. Yates, ¶ 8; Decl. of R. Trimble, ¶ 9; Decl. of P. Brazelton, ¶ 13; Decl. of R. Fisher, ¶ 10; Decl. of D. Allen, ¶¶ 8-9; Decl. of A. Walker, ¶ 8; Decl. of K. Nash, ¶¶ 9, 54; Decl. of J. Bennett, ¶ 9; Decl. of D. Huckabay, ¶ 9; Decl. of E. McBride, ¶ 9; Decl. of D. McGee, ¶ 8.)

6.     Among the budgetary restrictions were a statewide hiring freeze and mandatory furlough days.  (Decl. of W. Myers, ¶ 15; see also Decl. of J. Yates, ¶ 8; Decl. of R. Trimble, ¶ 9; Decl. of R. Fisher, ¶ 10; Decl. of D. Allen, ¶¶ 8-9; Decl. of A. Walker, ¶¶ 8-9; Decl. of K. Nash, ¶¶ 9-

---

[1] Plaintiff neither filed his own separate statement of disputed facts nor admitted or denied the facts set forth by defendant as undisputed.  Local Rule 56-260(b).  Therefore, Defendants' statement of undisputed facts is accepted except where brought into dispute by Plaintiff's verified complaint.  Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004) (verified complaint may be used as an opposing affidavit if it is based on pleader's personal knowledge of specific facts which are admissible in evidence).

[2] All page citations in reference to the fourth amended complaint are to the page numbers assigned in the Court's ECF pagination headers.

[3] All page citations to Exhibit A of the Declaration of J. Mathison are to the "AGO.###" numbers that are Bates-stamped in the bottom right corner of the document.

10; Decl. of J. Bennett, ¶¶ 9-11; Decl. of D. Huckabay, ¶¶ 9-11; Decl. of E. McBride, ¶¶ 10-11; Decl. of D. McGee, ¶¶ 8-9; Decl. of B. Farkas, ¶ 10.)

   7.    Prior to December 2008, PVSP employed four full-time State Chaplains; a Protestant Chaplain, a Muslim Chaplain, a Native American Spiritual Advisor, and a Catholic Chaplain.  (Decl. of M. Myers, ¶ 16; see also Decl. of J. Mathison, Ex. A at AGO.015-016 [Pl. Dep., 33:22-34:11]; Decl. of J. Yates, ¶ 8; Decl. of R. Trimble, ¶ 10; Decl. of P. Brazelton ¶ 14; Decl. of K. Nash, ¶ 11; Decl. of B. Farkas, ¶ 10; Decl. of D. McGee, ¶ 10.)

   8.    When Plaintiff first arrived at PVSP in 2006, M. Salaam was employed as the Muslim Chaplain.  (Decl. of J. Mathison, Ex. A at AGO.009 [Pl. Dep., 23:8-12].)

   9.    Chaplain Salaam provided the following services, among others, to the Muslim inmates: offered spiritual advice; signed and processed religious orders; retrieved religious orders from Receiving and Releasing (R&R); purchased food or solicited donations from vendors for religious festivals; coordinated Muslim speakers; and managed funds donated by the community for the Muslim inmates.  (Decl. of W. Myers, ¶¶ 55-56; see also Decl. of J. Mathison, Ex. A at AGO.074 [Pl. Dep., Ex. Q]; Decl. of B. Farkas, ¶¶ 31-36, 45.)

   10.   When Chaplain Salaam was employed at PVSP, Plaintiff experienced "minimal" issues with respect to religious accommodations.  (Decl. of J. Mathison, Ex. A [Pl. Dep., 29:7-19]; Pl.'s Fourth Am. Compl., ECF No. 50 at 9.)

   11.   On December 5, 2008, Muslim Chaplain M. Salaam transferred to another institution.  (Decl. of J. Mathison, Ex. A [Pl. Dep., 30:16-18]; Pl.'s Fourth Am. Compl., ECF No. 50 at 10]; see also Decl. of W. Myers, ¶¶ 18, 95; Decl. of P. Brazelton, ¶¶ 16, 56; Decl. of R. Trimble, ¶ 11; Decl. of J. Yates, ¶ 12; Decl. of B. Farkas, ¶ 12; Decl. of D. McGee, ¶ 12; Decl. of K. Nash, ¶ 13.)

   12.   Additionally, as of August 2010, the Native American Spiritual Advisor was no longer employed at PVSP.  (Decl. of W. Myers, ¶ 19; see also Decl. of J. Yates, ¶ 13; Decl. of P. Brazelton, ¶ 17; Decl. of R. Fisher, ¶ 12; Decl. of D. McGee, ¶ 13; Decl. of B. Farkas, ¶ 13.)

   13.   During the time period relevant to the fourth amended complaint, PVSP did not hire a Muslim Chaplain.  This was largely caused by budgetary constraints, the hiring freeze, and a lack of qualified applicants.  (Decl. of W. Myers, ¶ 20; see also Decl. of J. Yates, ¶ 14; Decl. of R. Trimble, ¶

6

12; Decl. of P. Brazelton, ¶ 18; Decl. of R. Fisher, ¶ 13; Decl. of K. Nash, ¶ 14; Decl. of B. Farkas, ¶ 14; Decl. of D. McGee, ¶ 17.)

14.     Between 2009 and 2011, there were periods when PVSP had three or fewer Chaplains. (Decl. of W. Myers, ¶¶ 21-22, 25; see also Decl. of D. McGee, ¶ 16; Decl. of R. Fisher, ¶ 11; Decl. of B. Farkas, ¶¶ 15-16; Decl. of D. Huckabay, ¶ 10.)

15.     The two or three remaining State Chaplains were responsible for overseeing approximately fourteen different religious groups across five facilities at PVSP.  This included supervising chapel services, handling Religious Diet Requests, and delivering Religious Special Purchase Packages (R-SPPs), among other tasks.  (Decl. of W. Myers, ¶ 24; Decl. of D. McGee, ¶ 16.)

16.     The lack of State Chaplains impacted PVSP's ability to, among other things: provide inmate access to the Facility Chapel; coordinate donations of funds or ceremonial foods for inmate religious events; and distribute Religious Special Purchase Packages.  (Decl. of W. Myers, ¶ 23; see also Decl. of J. Yates, ¶ 15; Decl. of R. Trimble, ¶ 12; Decl. of P. Brazelton, ¶ 19; Decl. of R. Fisher, ¶ 14; Decl. of K. Nash, ¶ 15; Decl. of B. Farkas, ¶ 17; Decl. of D. McGee, ¶¶ 14-15.)

17.     As of at least March 2009, Plaintiff possessed the following religious artifacts to use in his cell: a Kufi cap, a prayer rug, prayer beads, and prayer oil.  (Decl. of J. Mathison, Ex. A at AGO.072 (Pl. Dep., Ex. Q).)

18.     As of March 17, 2009, Plaintiff believed that Facility A staff was accommodating the Muslim religious program "fairly well."  (Decl. of J. Mathison, Ex. A at AGO.046 (Pl. Dep., Ex. B).)

19.     PVSP has a Religious Review Committee (RRC), comprised of representatives from key sectors of the institution (e.g., custody, religious programs, food services, administration), which is designed to address religious issues affecting inmates.  (Decl. of W. Myers, ¶¶ 10-12; see also Decl. of P. Brazelton, ¶ 12; Decl. of R. Fisher, ¶ 9.)

20.     During the time period relevant to the fourth amended complaint, Defendants Allen, Bennett, Brazelton, Fisher, Huckabay, McBride, Trimble, Walker, Yates, Cate, Davis and Giurbino did not attend RRC meetings.  (Decl. of D. Allen, ¶ 7; Decl. of J. Bennett, ¶ 8; Decl. of P. Brazelton, ¶ 12; Decl. of R. Fisher, ¶ 9; Decl. of D. Huckabay, ¶ 8; Decl. of E. McBride, ¶ 8; Decl. of R. Trimble, ¶

7; Decl. of A. Walker, ¶ 7; Decl. of J. Yates, ¶ 7; Decl. of M. Cate, ¶ 3; Decl. of Giurbino, ¶ 3; Decl. of Davis, ¶ 3.)

21.     Defendants Allen, Bennett, Huckabay, McBride, Cate, Giurbino, Davis and Walker did not take part in any decision to adopt any particular religious policy for PVSP proposed by the RRC or the Warden.  (Decl. of D. Allen, ¶ 7; Decl. of J. Bennett, ¶ 8; Decl. of D. Huckabay, ¶ 8; Decl. of E. McBride, ¶ 8; Decl. of A. Walker, ¶ 7; Decl. of M. Cate, ¶ 3; Decl. of Giurbino, ¶ 3; Decl. of Davis, ¶ 3.)

22.     During the time period relevant to the fourth amended complaint, Plaintiff was housed on Facility A.  (Decl. of J. Mathison, Ex. A [Pl. Dep., 35:1-25].)

23.     Facility A was a "Level IV" facility.  (Decl. of W. Myers, ¶ 28.)

24.     A Level IV facility is the highest security facility provided within the CDCR institutions.  (Decl. of W. Myers, ¶ 28.)

25.     Level IV inmates have less freedom of movement than lower-level inmates.  (Decl. of W. Myers, ¶ 28.)

26.     Because Facility A was a Level IV facility, staff supervision during chapel services was essential to ensuring the safety and security of inmates and staff.  (Decl. of W. Myers, ¶¶ 32, 34; <u>see also</u> Decl. of D. Allen, ¶ 17; Decl. of A. Walker, ¶ 16; Decl. of J. Bennett, ¶ 19; Decl. of P. Brazelton, ¶ 26; Decl. of D. Huckabay, ¶ 14; Decl. of R. Fisher, ¶ 21; Decl. of E. McBride, ¶ 14; Decl. of D. McGee, ¶ 27; Decl. of K. Nash, ¶ 20; Decl. of R. Trimble, ¶ 17; Decl. of J. Yates, ¶ 22.)

27.     According to CDCR regulations, which Defendants were bound to follow, supervision of Level IV inmates must be direct and constant.  (Decl. of W. Myers, ¶ 32; <u>see also</u> Decl. of D. Allen, ¶ 17; Decl. of A. Walker, ¶ 16; Decl. of J. Bennett, ¶ 19; Decl. of P. Brazelton, ¶ 26; Decl. of D. Huckabay, ¶ 14; Decl. of R. Fisher, ¶ 21; Decl. of E. McBride, ¶ 14; Decl. of D. McGee, ¶ 27; Decl. of R. Trimble, ¶ 17; Decl. of J. Yates, ¶ 22.)

28.     Anytime Level IV inmates are left unsupervised, particularly in an area shielded from sight, such as a chapel, there is a significant risk that illegal activity will occur.  (Decl. of D. Allen, ¶ 18; <u>see also</u> Decl. of A. Walker, ¶ 17; Decl. of J. Bennett, ¶ 20; Decl. of P. Brazelton, ¶ 27; Decl. of R.

Fisher, ¶ 22; Decl. of D. Huckabay, ¶ 15; Decl. of E. McBride, ¶ 15; Decl. of K. Nash, ¶ 21; Decl. of J. Yates, ¶ 23.)

29.     It was not uncommon for custody staff to find drugs or weapons in the facility chapels during routine searches.  (Decl. of D. Allen, ¶¶ 18, 20; <u>see also</u> Decl. of J. Mathison, Ex. A at AGO.047 [Pl. Dep., Ex. B]; Decl. of A. Walker, ¶ 17; Decl. of J. Bennett, ¶ 20; Decl. of P. Brazelton, ¶ 27; Decl. of D. Huckabay, ¶ 16; Decl. of E. McBride, ¶ 16; Decl. of D. McGee, ¶ 29.)

30.     Fights or illegal sexual behavior in the facility chapels were also common.  (Decl. of D. Allen, ¶ 18; <u>see also</u> Decl. of A. Walker, ¶ 17; Decl. of J. Bennett, ¶ 21; Decl. of P. Brazelton, ¶ 28; Decl. of D. Huckabay, ¶ 17; Decl. of E. McBride, ¶ 17; Decl. of D. McGee, ¶ 28; Decl. of K. Nash, ¶ 22; Decl. of J. Yates, ¶ 24.)

31.     A few years prior to the events at issue in the fourth amended complaint, unsupervised inmates had rioted in a facility chapel at PVSP.  (Decl. of D. Allen, ¶ 19; <u>see also</u> Decl. of P. Brazelton, ¶ 29; Decl. of D. Huckabay, ¶ 18; Decl. of K. Nash, ¶ 23.)

32.     A few years prior to the events at issue in the fourth amended complaint, unsupervised inmates had rioted in a facility chapel at another institution.  (Decl. of A. Walker, ¶ 18.)

33.     From 2008 through 2012, PVSP was not properly funded or staff for custody staff to provide ongoing chapel supervision in Facility A.  (Decl. of J. Yates, ¶ 25; <u>see also</u> Decl. of R. Trimble, ¶ 18; Decl. of P. Brazelton, ¶ 30; Decl. of D. Allen, ¶ 21; Decl. of A. Walker, ¶ 19; Decl. of R. Fisher, ¶ 23; Decl. of J. Bennett, ¶ 23; Decl. of W. Myers, ¶ 33; Decl. of K. Nash, ¶ 24; Decl. of D. McGee, ¶ 30.)

34.     Throughout the time period relevant to the fourth amended complaint, chapel access frequently depended on the availability of a State Chaplain or approved religious volunteer.  (Decl. of W. Myers, ¶ 33; <u>see also</u> Decl. of D. Allen, ¶ 21; Decl. of P. Brazelton, ¶ 30; Decl. of R. Fisher, ¶ 23; Decl. of D. McGee, ¶ 30; Decl. of K. Nash, ¶ 24; Decl. of R. Trimble, ¶ 18; Decl. of A. Walker, ¶ 19; Decl. of J. Yates, ¶ 25.)

35.     Custody supervision of the Facility Chapels—as opposed to supervision by a State Chaplain—is problematic because it can endanger the safety of staff and inmates in the event of an emergency elsewhere in the prison.  (Decl. of W. Myers, ¶ 34.)

36.     Around mid-2008, PVSP's DOM Supplement was in the process of being revised, such that chapel access would depend on the availability of a State Chaplain, approved religious volunteer, or a staff sponsor being present to supervise.  (Decl. of J. Yates, ¶¶ 26-28; <u>see also</u> Decl. of W. Myers, ¶¶ 35, 37; Decl. of D. Allen, ¶ 22; Decl. of A. Walker, ¶ 20; Decl. of J. Bennett, ¶ 22; Decl. of P. Brazelton, ¶ 31; Decl. of K. Nash, ¶ 25; Decl. of D. Huckabay, ¶ 19; Decl. of R. Fisher, ¶ 24; Decl. of E. McBride, ¶ 18; Decl. of D. McGee, ¶ 31; Decl. of A. Shimmin, ¶ 11; Decl. of R. Trimble, ¶ 19.)

37.     This policy was adopted in part because of budgetary and safety concerns.  (Decl. of W. Myers, ¶ 36.)

38.     This policy was also adopted in part at the recommendation of CDCR Headquarters, due to state-wide security issues concerning unsupervised inmates.  (An assault had occurred at another prison where staff had been stabbed by unsupervised inmates who charged into a program office.)  (Decl. of W. Myers, ¶ 36; Decl. of J. Yates, ¶ 20.)

39.     Plaintiff claims that former Facility A Captain Perry wrote a memorandum authorizing custody staff to provide ongoing supervision of chapel services.  (Pl.'s Fourth Am. Compl., ECF No. 50 at 10; see also Decl. of W. Myers, ¶ 39; Decl. of D. Allen, ¶ 23.)

40.     Captain Perry's unofficial policy was never adopted into CDCR regulations or the Department Operations Manual.  (Decl. of J. Mathison, Ex. A [Pl. Dep., at 33:2-14].)

41.     Defendants Allen, Bennett, Brazelton, Fisher, Huckabay, McBride, McGee, Myers, Nash, Shimmin, Trimble, Walker, Giurbino, Davis and Cate did not draft the PVSP DOM Supplement's policy concerning chapel supervision. (Decl. of D. Allen, ¶ 25; Decl. of J. Bennett, ¶ 24; Decl. of P. Brazelton, ¶ 32; Decl. of R. Fisher, ¶ 25; Decl. of D. Huckabay, ¶ 20; Decl. of E. McBride, ¶ 19; Decl. of D. McGee, ¶ 32; Decl. of W. Myers, ¶ 38; Decl. of K. Nash, ¶ 26; Decl. of A. Shimmin, ¶ 13; Decl. of R. Trimble, ¶ 20; Decl. of A. Walker, ¶ 21; Decl. of M. Cate, ¶ 3; Decl. of Davis, ¶ 3; Decl. of Giurbino, ¶ 3.)

42.     Defendants Allen, Huckabay, Fisher, McBride, Nash, Walker, Giurbino, Davis and Cate did not participate in the decision to adopt the chapel supervision policy.  (Decl. of D. Allen, ¶ 25; Decl. of D. Huckabay, ¶ 20; Decl. of R. Fisher, ¶ 24; Decl. of E. McBride, ¶ 19; Decl. of K. Nash, ¶ 26; Decl. of A. Walker, ¶¶ 21-22; Decl. of M. Cate, ¶ 5; Decl. of Davis, ¶ 3; Decl. of Giurbino, ¶ 3.)

43.     Defendants Allen, Bennett, Huckabay, McBride, McGee, Myers, Nash, Shimmin, Trimble and Walker did not have the authority to unilaterally revise the PVSP DOM Supplement or the specific policy requiring chapel supervision by a State Chaplain or religious volunteer.  (Decl. of D. Allen, ¶ 25; Decl. of J. Bennett, ¶ 24; Decl. of D. Huckabay, ¶ 20; Decl. of E. McBride, ¶ 19; Decl. of D. McGee, ¶ 33; Decl. of W. Myers, ¶ 40; Decl. of K. Nash, ¶¶ 25-27; Decl. of A. Shimmin, ¶ 12; Decl. of R. Trimble, ¶ 19; Decl. of A. Walker, ¶ 22.)

44.     Defendants Allen, Bennett, Brazelton, Fisher, Huckabay, McBride, McGee, Myers, Nash, Shimmin, Trimble, Davis and Walker were required to enforce the DOM Supplement's chapel supervision policy as written.  (Decl. of D. Allen, Decl. of J. Bennett, ¶ 24; Decl. of P. Brazelton, ¶ 33; Decl. of R. Fisher, ¶ 25; Decl. of D. Huckabay, ¶ 20; Decl. of E. McBride, ¶ 19; Decl. of D. McGee, ¶ 33; Decl. of W. Myers, ¶ 40; Decl. of K. Nash, ¶ 27; Decl. of A. Shimmin, ¶¶ 13-14; Decl. of R. Trimble, ¶ 21; Decl. of Davis, ¶ 3; Decl. of A. Walker, ¶ 22.)

45.     Defendants Allen, Bennett, Brazelton, Fisher, Huckabay, McBride, McGee, Myers, Nash, Shimmin, Trimble and Walker could have been disciplined, or even fired, for not enforcing this policy.  (Decl. of D. Allen, ¶ 25; Decl. of J. Bennett, ¶ 24; Decl. of P. Brazelton, ¶ 33; Decl. of R. Fisher, ¶ 26; Decl. of D. Huckabay, ¶ 20; Decl. of E. McBride, ¶ 19; Decl. of D. McGee, ¶ 33; Decl. of W. Myers, ¶ 40; Decl. of K. Nash, ¶ 27; Decl. of A. Shimmin, ¶ 14; Decl. of R. Trimble, ¶ 21; Decl. of A. Walker, ¶ 22.)

46.     According to CDCR regulations, which all Defendants were bound to follow, ensuring custodial security and the safety of staff, inmates, and the public must take precedence over all other considerations in the operation of programs and activities within the institution.  (Decl. of W. Myers, ¶ 41; see also Decl. of D. Allen, ¶ 26; Decl. of J. Bennett, ¶ 25; Decl. of P. Brazelton, ¶ 34; Decl. of R. Fisher, ¶ 27; Decl. of D. Huckabay, ¶ 21; Decl. of E. McBride, ¶ 20; Decl. of D. McGee, ¶ 34; Decl. of K. Nash, ¶ 28; Decl. of A. Shimmin, 15; Decl. of R. Trimble, ¶ 22; Decl. of A. Walker, ¶ 23; Decl. of J. Yates, ¶ 30.)

47.     During the time period relevant to the fourth amended complaint, due to severe budgetary restrictions and the fact that PVSP was down to two State Chaplains, chapel access was often restricted for lack of supervision.  (Decl. of J. Yates, ¶ 31; see also Decl. of D. Allen, ¶ 27; Decl.

of A. Walker, ¶ 24; Decl. of J. Bennett, ¶ 26; Decl. of R. Trimble, ¶ 23; Decl. of P. Brazelton, ¶ 35; Decl. of R. Fisher, ¶ 28; Decl. of D. Huckabay, ¶ 22; Decl. of E. McBride, ¶ 21; Decl. of D. McGee, ¶ 35; Decl. of K. Nash, ¶ 29; Decl. of W. Myers, ¶ 42.)

48. From January 2009 through at least March 2009, Plaintiff was able to attend the weekly Ta'leem and Jumu'ah services in the Facility A Chapel. (Decl. of J. Mathison, Ex. A at AGO.048-049 [Pl. Dep., Ex. B].)

49. Plaintiff was able to attend at least twenty-nine Ta'leem services (Thursdays) and thirty-two Jum'uah services (Fridays) in 2009. There were fifty-three Thursdays and fifty-two Fridays in 2009. (Decl. of J. Mathison, Ex. A at AGO.053-054 [Pl. Dep., Ex. C]; Decl. of A. Whisnand in Supp. Defs' Req. Judicial Notice, ¶¶ 1-6; see also Decl. of J. Mathison, Ex. A at AGO.056 [Pl. Dep., Ex. E].)

50. Only three Ta'leem services and two Jum'uah services in 2009 were cancelled because of "denials"—the remainder were cancelled because of lockdowns or modified program. (Decl. of J. Mathison, Ex. A at AGO.056 [Pl. Dep., Ex. E].)

51. Inmates on Facility A were only prevented from attending the 2009 Ramadan services twice in September 2009.

52. PVSP's 2009 Ramadan program was the "smoothest" on Facility A. (Decl. of J. Mathison, Ex. A at AGO.066-067 [Pl. Dep., Ex. O].)

53. To accommodate all religious groups at PVSP, the two remaining State Chaplains were scheduled to supervise as many additional services outside their own religion as possible. (Decl. of D. McGee, ¶¶ 38-31; Decl. of W. Myers, ¶ 45.)

55. Although the two Chaplains could supervise other religious groups' services when able, they were neither qualified nor expected to conduct services for other faith groups. (Decl. of W. Myers, ¶ 46.)

56. Staff actively sought volunteers to supervise Muslim services during the time PVSP lacked a Muslim Chaplain. (Id. at ¶ 47.)

57. Defendant Myers personally volunteered to supervise at least two inmate religious services for each religious group at PVSP. (Id. at ¶ 48.)

12

58. Defendant Allen met with various inmate advisory groups and proposed ways to improve chapel access—such as closing dayroom programming to free up a custody officer—but these groups rejected his proposals. (Decl. of D. Allen, ¶ 30; Decl. of J. Mathison, Ex. A at AGO.084-086 [Pl. Dep., Ex. Q].)

59. Defendants Allen and Walker utilized Education Officers to provide chapel coverage, when staffing permitted. (Decl. of D. Allen, ¶¶ 3-31; Decl. of A. Walker, ¶¶ 27-28; Decl. of J. Bennett, ¶¶ 32-33; Decl. of E. McBride, ¶ 26; Decl. of P. Brazelton, ¶¶ 38-39; Decl. of R. Fisher, ¶ 31.)

60. Defendants Allen, Bennett, Huckabay, McBride, and Walker often permitted religious groups to gather for approved religious functions on the Facility A Recreation Yard, in the event the Facility A Chapel was not available. (Decl. of D. Allen, ¶ 34; Decl. of J. Bennett, ¶¶ 29-31; Decl. of D. Huckabay, ¶¶ 26-27; Decl. of E. McBride, ¶¶ 25-27; Decl. of A. Walker, ¶ 29; Decl. of P. Brazelton, ¶ 37; Decl. of R. Fisher, ¶ 30; Decl. of W. Myers, ¶ 49; Decl. of J. Yates.)

61. Defendants Allen, Bennett, Huckabay, McBride, and Walker never ordered that inmate religious services be conducted on the Facility A. Recreation Yard, but rather suggested it as an alternate on days when access to the Facility A Chapel was restricted. (Decl. of D. Allen, ¶ 34; Decl. of J. Bennett, ¶ 31; Decl. of D. Huckabay, ¶ 27; Decl. of E. McBride, ¶ 27; Decl. of A. Walker, ¶ 29.)

62. According to Plaintiff, although Muslims are not "outdoor worshippers," they can nevertheless perform certain services outdoors. (Decl. of J. Mathison, Ex. A [Pl. Dep., 46:8-23].)

63. Plaintiff has participated in outdoor religious services on the Recreation Yard at PVSP. (Decl. of J. Mathison, Ex. A [Pl. Dep. at 47:8-17].)

64. Plaintiff also remained free to pray individually in his cell. (Decl. of D. Allen, ¶ 35; Decl. of A. Walker, ¶ 30.)

65. During periods of "modified program" or during a "lockdown," access to the Facility A Chapel—among other locations throughout PVSP—was restricted. (Decl. of J. Yates, ¶¶ 34-37; see also Decl. of D. Allen, ¶¶ 36-38; Decl. of A. Walker, ¶¶ 31-33; Decl. of J. Bennett, ¶¶ 34-36; Decl. of P. Brazelton, ¶¶ 40-42; Decl. of R. Fisher, ¶¶ 32-34.)

13

66.    Modified program or lockdown could be implemented for a number of reasons, including inclement weather affecting the security of the institution (e.g., heavy fog), insufficient staffing (e.g., staff training days, mandated furloughs, staff diversion programs, etc.), or for security reasons (e.g., unusual occurrence, contraband searches, etc.)  (Decl. of J. Yates, ¶¶ 34-37; Decl. of D. Allen, ¶¶ 36-38; Decl. of A. Walker, ¶¶ 31-33; Decl. of J. Bennett, ¶¶ 34-36; Decl. of P. Brazelton, ¶¶ 40-42; Decl. of R. Fisher, ¶¶ 32-34.)

67.    "Rolling lockdowns"—yard-specific lockdowns implemented because of budgetary constraints—were also common during this time period.  (Decl. of J. Yates, ¶ 38; Decl. of D. Allen, ¶¶ 39-40; Decl. of A. Walker, ¶¶ 34-35; Decl. of J. Bennett, ¶ 37; Decl. of P. Brazelton, ¶ 43; Decl. of R. Fisher, ¶ 35; Decl. of J. Mathison, Ex. A at AGO.054 [Pl. Dep., Ex. C].)

68.    Facility A was on lockdown and/or modified program during the following time periods: January 1, 2009 to February 6, 2009 (discovery of inmate-manufactured weapons); March 20, 2009 to April 12, 2009 (riot on Facility A Recreation Yard); May 1, 2009 to May 3, 2009 (riot on Facility A Recreation Yard); July 7, 2009 to July 20, 2009 (medical equipment missing); September 11, 2009 to September 14, 2009 (battery on a peace officer); September 23, 2009 to October 5, 2009 (discovery of inmate-manufactured weapons); August 6, 2010 to September 8, 2010 (kitchen equipment missing); April 11, 2011 to April 28, 2011 (equipment missing; inmate-manufactured weapons); July 29, 2011 to August 1, 2011 (metal stock missing from Program Office); August 18, 2011 to August 19, 2011 (kitchen equipment missing); and September 8, 2011 to September 22, 2011 (metal stock missing, inmate-manufactured weapons).  (Decl. of J. Yates, ¶¶ 39-41.)

69.    From 2009 through 2011, Facility A was on lockdown and/or modified program for a total of 137 days, including 21 Thursdays and 23 Fridays.  (Id.)

70.    Chapel restriction during periods of modified program or lockdown was essential to ensuring that custody staff were adequately positioned to protect the safety and security of the institution.  (Decl. of J. Yates, ¶ 42; Decl. of D. Allen, ¶ 41; Decl. of A. Walker, ¶ 36; Decl. of J. Bennett, ¶ 39; Decl. of P. Brazelton, ¶ 44; Decl. of R. Fisher, ¶ 36.)

///
///

71.     During a lockdown or a period of modified program, inmates remained free to pray or conduct personal religious services in their cells.  (Decl. of J. Yates, ¶ 43; Decl. of D. Allen, ¶ 42; Decl. of A. Walker, ¶ 37; Decl. of P. Brazelton, ¶45; Decl. of R. Fisher, ¶ 37.)

72.     As of 2009, inmates at PVSP were prohibited from ordering edible dates in their Religious Special Purchase Packages (R-SPPs).  (Decl. of B. Farkas, ¶ 18; Decl. of P. Brazelton, ¶¶ 47-48; Decl. of R. Fisher, ¶ 40; Decl. of W. Myers, ¶ 52; Decl. of K. Nash, ¶ 32; Decl. of A. Shimmin, ¶ 18; Decl. of J. Yates, ¶ 45.)

75.     Inmates were prohibited from ordering edible dates on the grounds that fruit delivered in packages can spoil and cause health risks.  (Decl. of W. Myers, ¶ 52; Decl. of B. Farkas, ¶ 19; Decl. of P. Brazelton, ¶ 48; Decl. of R. Fisher, ¶ 40; Decl. of K. Nash, ¶ 32; Decl. of A. Shimmin, ¶ 19; Decl. of R. Trimble, ¶ 27; Decl. of A. Walker, ¶ 40; Decl. of J. Yates, ¶ 45.)

76.     Inmates were also prohibited from ordering edible dates on the grounds that dates can be used to create inmate-manufactured alcohol, i.e., "pruno".  (Decl. of W. Myers, ¶ 52; Decl. of J. Mathison, Ex. A [Pl. Dep., at 79:16-80:21]; Decl. of B. Farkas, ¶ 19; Decl. of P. Brazelton, ¶ 48; Decl. of R. Fisher, ¶ 40; Decl. of K. Nash, ¶ 32; Decl. of A. Shimmin, ¶ 19; Decl. of R. Trimble, ¶ 27; Decl. of A. Walker, ¶ 40; Decl. of J. Yates, ¶ 45.)

77.     Although inmates can make "pruno" from almost any fruit item, edible dates present unique security concerns in that they are easily concealable from staff and can be smuggled throughout the prison without notice.  (Decl. of W. Myers, ¶ 53.)

78.     Plaintiff has received a Rules Violation Report for making inmate-manufactured alcohol.  (Decl. of J. Mathison, Ex. A [Pl. Dep., at 80:22-81:8].)

79.     At its June 8, 2009 and December 1, 2009 meeting, the RRC reaffirmed that it was PVSP's policy to prohibit inmates from ordering eligible dates in their R-SPPs.  (Decl. of W. Myers, ¶¶ 51, 54; Decl. of A. Shimmin, ¶ 19.)

80.     Defendants Brazelton, Fisher, McGee, Trimble, Walker, Davis, Giurbino and Cate were not involved in the RRC's recommendation to prohibit edible dates in R-SPPs.

81.     Eating dates to break the fast during Ramadan, while a historical Islamic tradition, is neither a central tenet nor one of the "Five Pillars" of the Muslim faith.  (Decl. of J. Mathison, Ex. A

(Pl. Dep., at 23:13-24:5, 68:3-21, 69:8-70:1, 77:24-78:9); see also Pl.'s Fourth Am. Compl, ECF No. 50 at 7.)

82. During the time period relevant to the fourth amended complaint, the State's budgetary crisis impacted PVSP Food Services' ability to provide ceremonial food at inmate religious events. (Decl. of B. Farkas, ¶¶ 20-24; see also Decl. of J. Mathison, Ex. A at AGO-062-063 [Pl. Dep., Ex. L]; Decl. of K. Nash, ¶ 35; Decl. of J. Yates, ¶ 49.)

83. During the time period relevant to the fourth amended complaint, PVSP did not have a budget to provide ceremonial foods at inmate religious functions. (Decl. of B. Farkas, ¶¶ 24-29; Decl. of W. Myers, ¶ 57; Decl. of K. Nash, ¶ 35; Decl. of J. Yates, ¶ 49.)

84. Due to budgetary and health concerns, PVSP also could not cater inmate religious events. (Decl. of B. Farkas, ¶¶ 27-29.)

85. In lieu of providing ceremonial food, Food Services provided regular food items (i.e., food the institution already possessed) to inmate religious events, such as coffee and cake. (Decl. of B. Farkas, ¶¶ 30, 43; Decl. of K. Nash, ¶ 38.)

86. Before his departure from PVSP, Chaplain Salaam would secure outside food donations for inmate religious events. (Decl. of B. Farkas, ¶¶ 31-33; Decl. of W. Myers, ¶¶ 55-56.)

87. Chaplain Salaam did not depend on State funding to provide food for inmate religious events, and would rely solely on donations. (Decl. of B. Farkas, ¶¶ 31-33; Decl. of J. Mathison, Ex. A at AGO.028-029 [Pl. Dep., at 68:22-69:7]; Id. at AGO.062-063 [Pl. Dep., Ex. L].)

88. Since at least May 2007, PVSP has not provided State-funded, edible dates to inmate religious functions. (Decl. of B. Farkas, ¶¶ 5, 38.)

89. During the time period relevant to the fourth amended complaint, PVSP did not have a State-approved contract to purchase edible dates. (Decl. of B. Farkas, ¶ 38.)

90. During the time period relevant to the fourth amended complaint, PVSP did not have a budget to purchase edible dates. (Decl. of B. Farkas, ¶ 38; Decl. of J. Mathison, Ex. A at AGO.035-036 [Pl. Dep., at 79:16-80:15].)

91. During the time period he was employed at PVSP, Chaplain Salaam often obtained edible dates donated by the local Muslim community. (Decl. of B. Farkas, ¶¶ 34-35.)

92.     When Chaplain Salaam left PVSP in 2008, there was no one to coordinate the donation of religious ceremonial foods, including dates.  (Decl. of B. Farkas, ¶ 36.)

93.     At its June 8, 2009 meeting, the RRC prepared a memorandum recommending to the Warden to discontinue providing additional, State-provided food for the twice-per-year religious functions for each religious group due to budgetary and staff-resource limitations.  (Decl. of W. Myers, ¶ 57; Decl. of A. Shimmin, ¶ 20.)

94.     On July 6, 2009, Warden Yates issued a Memorandum entitled "Discontinuation of Food for Religious Events."  The memorandum stated that, due to budgetary and staff limitations, PVSP would only provide coffee or juice and cookies or cake for inmate religious events.  (Decl. of J. Yates, ¶¶ 47-49; Decl. of B. Farkas, ¶¶ 39-31; Decl. of K. Nash, ¶ 38.)

95.     Defendants Farkas and Nash did not have the ability to revise this policy and were required to enforce it as written.  (Decl. of B. Farkas, ¶42; Decl. of K. Nash, ¶ 39.)

96.     Defendants Farkas and Nash could have been disciplined, or even fired, for not enforcing the policy.  (Decl. of B. Farkas, ¶ 42; Decl. of K. Nash, ¶ 39.)

97.     Pursuant to Warden Yates' memorandum, Food Services provided coffee and cake for the 2009 Ramadan Id-ul-Fitr banquet for the Muslim inmates.  (Decl. of B. Farkas, ¶ 43.)

98.     PVSP's accounting department did not receive any donations to provide food for the Id-ul-Fitr Islamic Banquet in 2009—neither from inmate trust account withdrawals, nor from outside parties.  (Decl. of. W. Myers, ¶ 59.)

99.     No outside agency, religious group, or individual contacted Defendant Myers requesting to donate funds or food for the 2009 Id-ul-Fitr banquet.  (Decl. of W. Myers, ¶ 59.)

100.     According to Plaintiff, Ramadan "is all about the fasting and spirituality, not food." (Decl. of J. Mathison, Ex. A at AGO.065 [Pl. Dep., Ex. O].)

101.     Defendants Allen, Davis and McGee did not have any authority or control over whether PVSP would provide anything other than coffee and cake for the 2009 Ramadan Id-ul-Fitr banquet. (Decl. of D. Allen, ¶¶ 44-46; Decl. of Davis, ¶ 3; Decl. of D. McGee, ¶ 48.)

102.     On July 14, 2010, Defendant Yates rescinded the July 6, 2009, memorandum, "Discontinuation of Food for Religious Events," and reinstated State-provided food for inmate

religious functions. The cost of the religious foods were not to exceed the cost of the meal being replaced. (Decl. of J. Yates, ¶¶ 50-51.)

103.  On July 19, 2010, the RRC recommended to prohibit food or money donations to inmate religious events. (Decl. of W. Myers, ¶ 61; Decl. of B. Farkas, ¶ 44; Decl. of D. McGee, ¶¶ 46-48; Decl. of K. Nash, ¶ 40.)

104.  The RRC based its decision on: (1) difficulties in ensuring all donated food arrived from approved vendors; (2) difficulty in ensuring donated food was properly temperature-controlled e.g., properly-cooked or refrigerated; (3) the inability of the institution to properly accept and account for donated funds; and (4) concerns that inmates would be pressured to donate funds from their Inmate Trust Accounts for improper reasons (e.g., to pay off debts, extortion, etc.). (Decl. of W. Myers, ¶ 61; Decl. of B. Farkas, ¶ 44; Decl. of K. Nash, ¶ 40.)

105.  The shortage of State Chaplains was also a contributing factor in the RRC's decision to discontinue outside donations for inmate religious functions. (Decl. of W. Myers, ¶ 62; Decl. of B. Farkas, ¶ 45; Decl. of K. Nash, ¶ 40.)

106.  Defendants Allen, Brazelton, Fisher, McGee, Trimble, Walker, Davis, Giurbino and Cate were not personally involved in the decision to prohibit outside food or monetary donations for inmate religious functions at PVSP. (Decl. of D. Allen, ¶¶ 7, 46; Decl. of P. Brazelton, ¶ 49; Decl. of R. Fisher, ¶ 41; Decl. of D. McGee, ¶¶ 46-48; Decl. of A. Shimmin, ¶ 22; Decl. of R. Trimble, ¶ 28; Decl. of A. Walker, ¶ 41; Decl. of Davis, ¶ 3; Decl. of Giurbino, ¶ 3; Decl. of M. Cate, ¶ 3.)

107.  The Muslim faith requires that Muslims consume good, wholesome goods, and that they abstain from consuming things that God has prohibited in the Quran, including: meat that has not been slaughtered in the name of God; meat from already-dead animals; alcohol; and meat that still has blood on it. (Decl. of J. Mathison, Ex. A (Irvin Dep., 25:20-26:16) and Ex. C (Decl. of M. Hamiddulah, ¶¶ 4, 6).)

108.  On March 18, 2010, CDCR implemented a new "Religious Meat Alternate Program" (RMAP) diet. (Decl. of B. Farkas, ¶¶ 46-47; Decl. of W. Myers, ¶ 64.)

109.  Plaintiff voluntarily enrolled in the RMAP diet in 2010. (Decl. of J. Mathison, Ex. A [Pl. Dep., 24:14-25:10].)

110. Defendants Farkas and Myers did not have the ability to revise the RMAP diet and were required to enforce it as written. (Decl. of B. Farkas, ¶¶ 48, 59; Decl. of W. Myers, ¶ 68.)

111. Defendant Farkas could have been disciplined, or even fired, for not enforcing this policy. (Decl. of B. Farkas, ¶ 48.)

112. Defendants Brazelton, Farkas, Fisher, McGee, Myers, Nash, Trimble, Walker, Davis and Yates were not personally involved in the decision to implement the RMAP diet at PVSP. (Decl. of P. Brazelton, ¶ 51; Decl. of B. Farkas, ¶¶ 46-48, 59; Decl. of R. Fisher, ¶ 43; Decl. of D. McGee, ¶ 50; Decl. of W. Myers, ¶¶ 64, 68; Decl. of K. Nash, ¶ 44; Decl. of R. Trimble, ¶ 30; Decl. of A. Walker, ¶ 43; Decl. of Davis, ¶ 3; Decl. of J. Yates, ¶ 54.)

113. Defendants Brazelton, Fisher, McGee, Myers, Nash, Trimble, Walker, Davis and Yates did not have any authority to decide what foods would be served as part of the RMA diet. (Decl. of P. Brazelton, ¶ 51; Decl. of R. Fisher, ¶ 44; Decl. of D. McGee, ¶ 51; Decl. of W. Myers, ¶ 69; Decl. of K. Nash, ¶ 45; Decl. of R. Trimble, ¶ 31; Decl. of A. Walker, ¶ 44; Decl. of Davis, ¶ 3; Decl. of J. Yates, ¶ 55.)

114. Inmates are allowed to purchase halal certified pre-cooked, refrigeration-free food in their quarterly package from outside the prison. (Decl. of J. Mathison, Ex. B (Decl. of Susan Summersett, ¶ 16).)

115. Special meals, including meals with a halal menu, create increased demands on CDCR and prison staff in the form of extensive administrative, operation, budgetary and security functions. (Decl. of J. Mathison, Ex. B (Decl. of Susan Summersett, ¶¶ 9-10).)

116. During the time period relevant to the fourth amended complaint, because of staffing shortages, furloughs, security incidents and other issues, inmates sometimes experienced delays in receiving their R-SPPs from Receiving and Releasing (R&R). (Decl. of D. McGee, ¶¶ 52, 62; Decl. of W. Myers, ¶¶ 70, 76.)

117. The RRC implemented procedures to expedite the approval of R-SPP order forms, and to prevent forms from being rejected for being improperly filled out by the inmates. (Decl. of W. Myers, ¶¶ 77-79; 81-83.)

118. Defendants Myers implemented procedures to expedite the approval of R-SPP order forms. (Decl. of W. Myers, ¶ 79.)

119. Defendant Myers also implemented procedures to expedite delivery of R-SPPs once they had arrived at PVSP. (Decl. of W. Myers, ¶¶ 75-76.)

120. Plaintiff claims that three of his R-SPPs were returned or disapproved between 2008 and 2009. At least one of these packages was disapproved because it contained edible dates, which were prohibited. (Decl. of J. Mathison, Ex. A [Pl. Dep., 75:3-7, 82:21-83:8].)

121. At its June 8, 2009 and December 1, 2009 meetings, the RRC recommended to prohibit inmates from possessing more than one ounce of religious prayer oil, to be kept in the Facility Chapels. Inmates would not be permitted to keep prayer oil in their cells. (Decl. of W. Myers, ¶¶ 87-89; Decl. of K. Nash, ¶ 48.)

122. Certain prayer oils are flammable, and can present security concerns in a prison. (Decl. of W. Myers, ¶¶ 87-88; Decl. of J. Yates, ¶ 61.)

123. Even non-flammable prayer oils present security risks, as inmates can heat the oil and throw it on other inmates or staff as a weapon. (Decl. of J. Yates, ¶ 62.)

124. Inmates can also use prayer oils to start fires in their cells. (Decl. of J. Yates, ¶¶ 59-63.)

125. It would be more difficult for an inmate to misuse prayer oil in a Facility Chapel, under supervision, than in his cell. (Decl. of J. Yates, ¶ 63.)

126. To ensure the safety and security of the institution, the RRC recommended that all religious oils must be tested for flammability prior to being allowed into the institution. (Decl. of W. Myers, ¶ 88.)

127. At some point between its December 1, 2009 meeting and its July 19, 2010 meeting, the RRC decided to temporarily suspend inmate purchases of religious prayer oils. This decision was made at the recommendation of CDCR Headquarters, due to statewide safety and security issues relating to prayer oils. (Decl. of W. Myers, ¶ 91; Decl. of K. Nash, ¶ 49.)

128. At its July 19, 2010 meeting, based on guidance from CDCR Headquarters, RRC recommended reinstating inmate prayer oils. Inmates were permitted to purchase up to two ounces of

one of six fragrances of oil, per quarter, from one of two approved distributors.  (Decl. of W. Myers, ¶ 92.)

129.    On August 3, 2010, a memorandum was issued under Defendant Yates' name allowing inmates to purchase up to two ounces of prayer oil per quarter.  (Decl. of J. Yates, ¶ 58.)

130.    At its July 19, 2010 meeting, the RRC recommended to allow inmates to wear religious artifacts (e.g., religious headwear, medallions, etc.) going to, during, and coming from religious events.  Under this policy, inmates were prohibited from wearing religious artifacts at any other time, such as during meal times or on the recreation yards.  This policy was consistent with CDCR regulations.  (Decl. of J. Yates, ¶ 66.)

131.    Allowing inmates—particularly Level IV inmates—to wear religious headwear throughout the institution increases the risk of contraband being smuggled between facilities.  (Decl. of J. Yates, ¶ 66.)

132.    The RRC also recommended on July 19, 2010 to limit the allowable colors of religious headwear to white or light-grey; stripes, designs, and logs were prohibited.  This policy was consistent with CDCR regulations.  (Decl. of W. Myers, ¶ 94; Decl. of K. Nash, ¶ 52; Decl. of J. Yates, ¶ 67.)

133.    Colored clothing items present security risks because inmates will use colors as a way to express gang affiliation.  Discouraging gang affiliation is a critical concern at all CDCR institutions.  (Decl. of J. Yates, ¶ 68; Decl. of K. Nash, ¶ 53.)

134.    During the hiring freeze, PVSP was severely limited as to what positions could be filled: certain security positions were exempt from the freeze, where as non-security positions, such as the State Chaplain positions, were not.  (Decl. of W. Myers, ¶ 96; Decl. of P. Brazelton, ¶ 57; Decl. of D. Huckabay, ¶ 10; Decl. of R. Fisher, ¶ 46; Decl. of K. Nash, ¶ 54; Decl. of R. Trimble, ¶ 37; Decl. of J. Yates, ¶ 70.)

135.    During the time period relevant to the fourth amended complaint, PVSP had submitted hiring freeze exemption requests for most of its vacant positions, including the vacant Muslim Chaplain position, but those were frequently denied.  (Decl. of W. Myers, ¶ 97; Decl. of P. Brazelton, ¶ 58; Decl. of R. Fisher, ¶ 47; Decl. of K. Nash, ¶ 55; Decl. of J. Yates, ¶ 71; Decl. of R. Trimble, ¶ 38.)

1      136.    PVSP staff notified Islamic mosques in Fresno and Oakland of the job opening, and

also asked them to provide volunteers to supervise religious services.  As of May 2010, there were no

applications on file at PVSP.  (Decl. of W. Myers, ¶ 99.)

      137.    Defendants Brazelton, Fisher, Myers, Nash, Shimmin, Yates, Davis, Giurbino and Cate

did not have any authority over the chaplain applicant pool, the hiring criteria, the timing associated

with hiring a new chaplain, or the availability of volunteers.  (Decl. of P. Brazelton, ¶¶ 60-61; Decl. of

R. Fisher, ¶ 50; Decl. of W. Myers, ¶¶ 102-103; Decl. of K. Nash, ¶ 58; Decl. of A. Shimmin, ¶ 23;

Decl. of R. Trimble, ¶¶ 40-41; Decl. of J. Yates, ¶¶ 73, 75; Decl. of Davis, ¶ 3; Decl. of Giurbino, ¶ 3;

Decl. of M. Cate, ¶ 3.)

      138.    The hiring freeze persisted through January 18, 2012, the date when PVSP received a

hiring freeze exemption from CDCR Headquarters.  (Decl. of W. Myers, ¶ 104; Decl. of J. Yates, ¶

76.)

      139.    The next Muslim Chaplain, Chaplain Johnson, was hired in May 2012.  (Decl. of D.

McGee, ¶ 18.)

**B.    Findings on Defendants' Motion**

Plaintiff contends that Defendants violated his right to exercise his religious while he was

housed at PVSP, and is pursuing claims under the First Amendment Free Exercise Clause, the

Religious Land Use and Institutionalized Persons Act (RLUIPA), and the Fourteenth Amendment

Equal Protection Clause.

Defendants move for summary judgment on the grounds that: (1) they did not substantially

burden Plaintiff's rights to exercise his religion, such that there is no First Amendment or RLUIPA

violation; (2) the actions taken and policies at issue concerning Plaintiff's exercise of his religion were

reasonable and based on legitimate penological interests, such that there is no First Amendment or

RLUIPA violation; (3) Defendant McGee did not discriminate against Plaintiff because of his

religious beliefs in violation of the Equal Protection Clause; and (4) Defendants are entitled to

qualified immunity.  Further, Defendants argue that summary judgment should be granted as to

Plaintiff's claims for injunctive relief because these claims are moot as he is no longer housed at

PVSP; and the Court should grant summary judgment or strike Plaintiff's punitive damages claims because there was no evil motive or intent by any Defendant.

1. First Amendment-Free Exercise

"[P]risoners retain the protections of the First Amendment" but their "right to freely exercise [their] religion is limited by institutional objectives and by the loss of freedom concomitant with incarceration." Hartmann v. California Dep't of Corr. & Rehab., 707 F.3d 1114, 1122 (9th Cir. 2013) (citing O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1997)). The protections of the Free Exercise Clause are triggered when prison officials substantially burden the practice of an inmate's religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith, but an impingement on an inmate's constitutional rights will be upheld "'if it is reasonably related to legitimate penological interests.'" Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008) (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). Courts apply a four-part test to balance the inmate's free exercise right against the state's legitimate penological interests to determine if a regulation is reasonable and constitutional. Turner, 482 U.S. at 89.

The Ninth Circuit has recently explained:

A person asserting a free exercise claim must show that the government action in question substantially burdens the person's practice of her religion. A substantial burden…places more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs…. To ensure that courts afford appropriate deference to prison officials, the Supreme Court has directed that alleged infringements of prisoners' free exercise rights be judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. The challenged conduct is valid if it is reasonably related to legitimate penological interests.

Jones v. Williams, 791 F.3d 1023, 1031-32 (9th Cir. 2015) (internal quotations and citations omitted). "It was well established in 2007, and remains so today, that government action places a substantial burden on an individual's right to free exercise of religion when it tends to coerce the individual to forego her sincerely held religious beliefs or to engage in conduct that violates those beliefs." Id. at 1033.

"'When a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" Shakur, 514 F.3d at 884 (quoting Turner

23

v. Safley, 482 U.S. 78, 89 (1987)).  In Turner, the Supreme Court articulated four factors to consider in determining whether a prison regulation is valid:

> (1)    Whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it";
>
> (2)    Whether there are "alternative means of exercising the right that remain open to prison inmates";
>
> (3)    Whether "accommodation of the asserted constitutional right" will "impact … guards and other inmates, and on the allocation of prison resources generally"; and
>
> (4)    Whether there is an "absence of ready alternatives" versus the "existence of obvious, easy alternatives."

Shakur, 514 F.3d at 882 (citing Turner, 482 U.S. at 89-90.)

### a.    Denial of Chapel Access

Plaintiff contends that Defendants implemented and enforced policies that reduced his faith's chapel services.  The policies implemented changes to the prison procedures so that chapel and other group prayer services/events were only allowed if supervision by a chaplain or other religious volunteer was available.[4]

Defendants contend that summary judgment is appropriate because the prohibition against unsupervised religious services was reasonable in light of PVSP's preservation in the safety and security of both the inmates and prison personnel.

Indeed, the Ninth Circuit has recognized that inmate-led religious services can pose security threats to the prison system, and applying the Turner factors has rejected a First Amendment challenge as to the same type of prison policy at issue.  See Anderson v. Angelone, 123 F.3d 1197, 1199 (9th Cir. 1997) ("Nevada's prohibition on inmate-led religious services does not violate the First Amendment.").  In addition, one other district court has rejected a First Amendment challenge to a prison policy at Kern Valley State Prison (KVSP) which prohibited unsupervised inmate ministers from leading religious services.  Davis v. Flores, No. 1:08cv01197-JTM (JMA), 2013 WL 969141, at

---

[4] In the operative fourth amended complaint, Plaintiff references the denial of chapel access and prayer services based on "Policy I" which denotes prison officials denied access based on modified programming and/or the unavailability of a chaplain/volunteer to supervise.  (Fourth Am. Compl. at 10.)

24

*1 (E.D. Cal. July 2, 2010).  In Davis, a prisoner brought suit against prison officials at KVSP because he was prohibited from attending religious services due to the dismissal of a Muslim chaplain and the prohibition against unsupervised services.  Defendants moved for summary judgment, and after reviewing the Turner factors, the Court found that no reasonable alternatives, such as unsupervised services in the yard were available.  The Davis court reasoned that allowing unsupervised religious services could strain KVSP's security, endangering both prisoners and prison staff, and summary judgment was granted in favor of Defendants.  Id. at *4.  The Davis court decision was affirmed on appeal by the Ninth Circuit, which found that summary judgment on the prisoner's First Amendment claim regarding the prohibition against unsupervised inmate-led religious services was appropriate because there was no genuine dispute of material fact as to whether the prohibition was reasonably related to legitimate penological interests.  Davis v. Flores, 592 Fed.Appx. 569 (9th Cir. 2015).

In following the reasoning of Davis court, the Court finds that applying the relevant Turner factors, Plaintiff has failed to raise a genuine issue of material fact as to whether PVSP's policy prohibiting unsupervised religious services was reasonably related to a legitimate penological interest.

In considering the first Turner factor, the court must "(1) determine whether the regulation is legitimate and neutral, and (2) assess whether there is a rational relationship between the governmental objective and the regulation."  Ashker v. California Dept. of Corrections, 350 F.3d 917, 922 (9th Cir. 2003).  Defendants have presented evidence that PVSP facility A is a Level IV facility, the highest level security facility provided within the CDCR institution, and houses the most violent and dangerous inmates who require the most supervision. (UDF[5] 23-26.)  CDCR regulations, which Defendants were bound to follow, requires supervision of Level IV inmates to be direct and constant, with staff supervision during chapel services essential to ensure the safety and security of inmates and staff.  (UDF 27-28.)  Defendants submit and it is undisputed that in areas which are shielded from sight, such as chapels, there is a significant risk that illegal activity will occur.  (UDF 28.)  In addition, it is not uncommon for custody staff to find drugs or weapons in the chapels during routine searches, and fights or illegal sexual behavior in the chapels also were common.  (UDF 29-30.)  Indeed, in the

---

[5] "UDF" refers to the Statement of Undisputed Facts.

few years prior to the events at issue in this case, unsupervised inmates had rioted in a PVSP chapel and in a chapel at another institution. (UDF 31-32.) Ongoing custody supervision of facility chapels is problematic because it can endanger the safety of staff and inmates in the event of an emergency, such as riots, fights, or medical emergencies. (UDF 35.) Accordingly, the first Turner factor weighs in favor of Defendants.

The second Turner factor considers "not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, … whether the inmates have been denied all means of religious express." Ward v. Walsh, 1 F.3d 873, 877-78 (9th Cir. 1993) (citing O'Lone, 482 U.S. at 351-52). As a Muslim inmate, Plaintiff could participate in outdoor religious services and he in fact did so on the recreation yard, which Defendants often permitted. (UDF 62-65.) Plaintiff also remained free to pray in his cell. (UDF 66.) Thus, there were alternative means available to Plaintiff. See O'Lone, 482 U.S. at 352 (ability on the part of prisoners to participate in other religious observances of their faith supports conclusion that the restrictions at issue are reasonable); Chau v. Young, No. C 13-764 SI (pr), 2014 WL 4100635, at *5 (N.D. Cal. Aug. 20, 2014) ("The denial of access to group religious services did not deprive Chau of all means of exercising his religious beliefs. Chau remained able to worship alone in his cell and had access, upon request, to an Islamic services to discuss spiritual matters").

The third consideration is to determine the impact the accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. Turner, 482 U.S. at 90. "When an accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Id. As previously stated, allowing unsupervised chapel services presented a safety risk to inmates and staff. In addition, supervision by custody staff created similar risks, in that custody staff were needed elsewhere. Further, at the relevant times at issue in this action, PVSP was operating under severe budgetary constraints and the prison did not generally have sufficient available resources. (UDF 5-16.)

As to the fourth Turner factor, the Court determines whether the regulation is an "exaggerated response" to the prison's concerns. Turner, 482 U.S. at 90-91. "The burden is on the prisoner

challenging the regulation to show that there are obvious, easy alternatives to the regulation." <u>Chau v. Young</u>, No. C 13-764 SI (PR), 2014 WL 4100635, *6 (N.D. Cal. Aug. 20, 2014) (citing <u>O'Lone</u>, 482 U.S. at 350). This determination is "not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." <u>Turner</u>, 482 U.S. at 91. Rather, the relative inquiry is "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a de minimis cost to the valid penological goal." <u>Overton v. Bazzetta</u>, 539 U.S. 126, 135-36 (2003). Given the evidence submitted by Defendants, there was not an easy and obvious ready alternative to the policy requiring chaplain supervised chapel services, and Plaintiff has not established the contrary.[6] Accordingly, based on the evidence before the Court, Defendants are entitled to summary judgment on Plaintiff's denial of access to chapel claim.

**b.    Denial of Religious Foods**

1).    <u>Edible Dates and Other Banquet Foods</u>

Defendants argue that the fact Plaintiff and other Muslim inmates were denied edible dates did not substantially burden their religious exercise. Indeed, it is undisputed that eating dates to break the fast during Ramadan and at other ceremonies, while a historical Islamic tradition, is neither a central tenet nor one of the "Five Pillars" of the Muslim faith. (UDF 81.) According to Plaintiff, Ramadan "is all about the fasting and spirituality, not food." (UDF 100.) In addition, since at least May 2007, PVSP has not provided State-funded, edible dates to inmate religious functions. (UDF 88.) Thus, based on the undisputed facts and evidence before the Court, being denied edible dates and other special banquet foods did not substantially burden Plaintiff's practice of his faith. Alternatively, even assuming denial of such foods substantially burdened the practice of Plaintiff's religion, Defendants are entitled to summary judgment because the restriction is reasonably related to legitimate penological interests. Under the first <u>Turner</u> factor, there is a rational connection between the

---

[6] To the extent Plaintiff contends that access to chapel services were denied for some other unrelated reason, such claim amounts to nothing more than a sporadic and intermittent denial of religious exercise, which does not give rise to a constitutional violation under the First Amendment. <u>See</u> <u>Canell v. Lightner</u>, 143 F.3d 1210, 1215 (9th Cir. 1998) (holding "short-term and sporadic" interference with inmate's prayer activities did not constitute substantial burden on free exercise of religion).

restrictions on dates and a justifying governmental interest.  It is undisputed that dates were prohibited because fruit delivered in packages can spoil and cause health risks.   Dates were also prohibited because they can be used to create inmate-manufactured alcohol, and they can be easily concealed and smuggled through the prison for that purpose.  (UDF 76-77.)  In fact, Plaintiff received a rules violation report for making inmate-manufactured alcohol.  (UDF 78.)  Under the second Turner factor, there were reasonable alternatives to eating dates and other specialty religious foods.  It is undisputed that eating dates to break fast during Ramadan and at other ceremonies, while a historical Islamic tradition, is neither a central tenet nor one of the "Five Pillars" of the Muslim faith.  (UDF 81.)  In addition, under PVSP's policies foods such as cookies, cake, coffee and juice were allowed and were provided at Muslim religious banquets.  (UDF 94, 97.)  Under the third Turner factor, allowing dates would have an adverse impact on guards, other inmates and PVSP resources generally.  Edible dates facilitated in inmate-manufactured alcohol, which contributed to the problem of potential inmate drunkenness, creating dangerous situations for both inmates and prison staff.  In addition, food for religious functions at PVSP was strained due to budgetary and staff resource shortages.  (UDF 92-94.) Lastly, under the Fourth Turner factor, there were no obvious, easy alternative to the prohibitions and restrictions on these religious foods, and Plaintiff has failed to demonstrate otherwise.  Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for denial of edible dates and other banquet foods.

2).    The Religious Meat Alternate Program

Plaintiff contends that the meals provided under the Religious Meat Alternative Program (RMAP), which was implemented by CDCR in March 2010, have no "religious significance" under strict halal standards.  (Fourth Am. Compl., ECF No. 50 at 17-18.)  Defendants submit evidence that the RMAP diet was designed for Muslim inmates and was created with the input of those of the Muslim faith.  (Decl. of B. Farkas, ¶¶ 46-47, 53, 58; Decl. of W. Myers, ¶ 64; Decl. of J. Mathison, Ex. A (Pl. Dep., at 73:17-23) & Ex. A at AGO.060-061).  Plaintiff voluntarily enrolled in the RMAP diet in 2010.  (UDF 112.)  Plaintiff has failed to demonstrate that the implementation of the RMAP substantially burdened the exercise of his faith.  Alternatively, even assuming that enrollment in the

RMAP posed a substantial burden on Plaintiff's religious practices, Defendants are entitled to summary judgment because the RMAP was reasonably related to legitimate penological interests.

Under the first <u>Turner</u> factor, there is a rational connection between the RMAP and the circumstances of CDCR's correction system. It is undisputed that special meals, including meals with a halal menu, create increased demands on CDCR and PVSP staff in the form of extensive administrative, operational, budgetary and security functions. (UDF 118.) Thus, the first <u>Turner</u> factor favors Defendants. Under the second <u>Turner</u> factor, there are "alternative" means available for Muslim inmates to consumed food in accordance with their faith, despite the fact that the RMAP was implemented to provide a halal diet. Inmates may request a vegetarian meal or a kosher meal. They may also obtain halal and kosher food in their quarterly package from outside the prison. (UDF 117.) Under the third <u>Turner</u> factor, the impact of accommodating Muslim inmates with a halal diet, as demonstrated above, is a significant matter in the context of prison resources generally. Under the fourth <u>Turner</u> factor, the RMAP is the alternative to provide Muslim inmates with a halal diet, and Plaintiff has not and cannot show an obvious, easy alternative to it. Accordingly, Defendants should be granted summary judgment on Plaintiff's claim regarding the RMAP.

      **c.     Denial of Religious Artifacts/Packages**

      1.    <u>Prayer Oils</u>

With regard to the restriction on prayer oils, there is a rational connection between the prison regulations and the governmental interest because prayer oils are flammable in nature and can potentially be used as a weapon when heated. Thus, prayer oils pose a safety and security risk. Thus, there is a rational connection between the risks associated with prayer oils and PVSP's policies limiting quantities that may be purchased by inmates and restricting the location to supervised chapels only. It is widely recognized that states have a legitimate, compelling interest in maintaining safety within penal institutions. <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 723 (2005). Accordingly, the first <u>Turner</u> factor weighs in favor of Defendants. With regard to the second <u>Turner</u> factor, as set forth above, Plaintiff was allowed to practice Islam in a variety of other ways, and prayer oils were available for Plaintiff to use in the chapel. Thus, the second <u>Turner</u> factor weighs in favor of Defendants. With regard to the third <u>Turner</u> factor, if Plaintiff and other Muslim inmates were

allowed to purchase unlimited quantities of prayer oil and keep it in their cells, the "ripple effect" would be increased risk of fire and scaldings at PVSP. See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 132-133 (1977) (when accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of correctional officials). Thus, the third Turner factor also weighs in favor of Defendants. With regard to the fourth Turner factor, there is no easy and obvious alternative to the restrictions imposed on prayer oils at PVSP, and Plaintiff has offered nothing to the contrary. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for denial of prayer oils.

        2.    <u>Kufi Caps and Apparel</u>

Plaintiff contends that Defendants' restriction on religious headwear and apparel violated his First Amendment right to religious freedom.

In order to determine whether the restriction amounted to a constitutional violation, the Court must evaluate the <u>Turner</u> factors. Allowing inmates—particularly Level IV inmates—to wear these items unrestricted increases the risk of contraband smuggling and gang colors display. Thus, the first <u>Turner</u> factor weighs in favor of Defendants. With regard to the second <u>Turner</u> factor, it is undisputed that Plaintiff is allowed to practice his religion in a multitude of other ways without the headwear and or apparel. In fact, Plaintiff possessed a Kufi cap, which he was allowed to wear while going to, attending, and returning from his religious events and services, and which he could also wear in his cell. (UDF 17.) Plaintiff also possessed a prayer rug and prayer beads. (<u>Id.</u>) Therefore, the second <u>Turner</u> factor weighs in favor of Defendants. With regard to the third <u>Turner</u> factor, the cumulative "ripple effect" to all persons at the prison by allowing all inmates to wear religious headwear and apparel without restrictions would have a significant adverse impact. If not restricted, it would facilitate gang affiliation and contraband movement. Thus, the third <u>Turner</u> factor weighs in favor of Defendants. Under the fourth <u>Turner</u> factor, there are no ready alternatives to the restrictions on religious headwear and apparel, and the absence of such ready alternatives is evidence of the reasonableness of the regulation. <u>Turner</u>, 482 U.S. at 90. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim regarding the denial of Kufi caps and apparel.

1

2         3.    <u>Religious Packages</u>

3         Plaintiff contends that during the incarceration at PVSP, there were problems in receiving

4 religious packages.

5         Defendants acknowledge that at times inmates encountered delays in receiving their religious

6 packages due to staffing shortages, furloughs and security incidents. (UDF 119.) However,

7 Defendants implemented procedures to address the problems and to expedite delivery. (UDF 120-

8 122.) Indeed, Plaintiff contends that three religious packages which were returned or disapproved

9 over a period of two years, and at least one of these contained dates. (Fourth Am. Compl. at 16, 18.)

10 This deprivation does not amount to a substantial burden on the practice of Plaintiff's religion. In fact,

11 by Plaintiff's own admission, as of March 2009, Plaintiff possessed everything to facilitate the practice

12 of his faith: prayer rug, prayer oil, prayer beads and a Kufi cap. (UDF 17.) Accordingly, Defendants

13 are entitled to summary judgment on Plaintiff's claim regarding receipt of his religious packages.

14         **d.     Failure to Hire a Muslim Chaplain**

15         Plaintiff contends that his right to free exercise of religion was violated because PVSP failed to

16 immediately replace and hire a State Chaplain of Muslim faith.

17         CDCR is not required to provide every religious sect or group within the prison system with a

18 chaplain. <u>Cruz v. Beto</u>, 405 U.S. 319, 322 n.2 (1972); <u>see also</u> <u>Allen v. Toombs</u>, 827 F.2d 563, 568

19 (9th Cir. 1987). Thus, PVSP did not have a duty to hire a State Chaplain of Muslim faith.

20 Notwithstanding the lack of such obligation, PVSP did hire a State Chaplin of Muslim faith, and when

21 the position became vacant, prison officials made affirmative efforts to try to replace or substitute the

22 Muslim Chaplain. (UDF 56-57.) Furthermore, when the Muslim Chaplain position was vacant, the

23 State Chaplains of other faiths at PVSP were responsible for accommodating the needs of Muslim

24 inmates as well as those of other faiths. (UDF 15, 53.) Indeed, Plaintiff acknowledged in March 2009,

25 that Facility A supervisory staff were accommodating the Muslim faith inmates in their religious

26 services. (Decl. of J. Mathison, Ex. A at AGO-046.) Thus, the shortage of Muslim Chaplains was

27 attributable to the budgetary cuts, hiring freeze and lack of volunteers, not the action or inaction of any

28 Defendant. Although PVSP did not hire a Muslim Chaplain from the time that Chaplain Salaam left

through the time Plaintiff was transferred from the prison (and beyond), it was because of budgetary constraints. It is undisputed that during the time at issue in this action, PVSP was under budgetary constraints and given the limited funds, custody positions were maintained over non-custody positions, to maintain the safety and security in the prison environment. (UDF 46, 141-148.) Therefore, there was a rational connection between legitimate penological reasons and the failure to hire a Muslim Chaplain. Accordingly, the first <u>Turner</u> factor weighs in favor of Defendants.

Under the second <u>Turner</u> factor, there were alternate means available to Plaintiff without having a Muslim State Chaplain (imam) working at PVSP. Plaintiff or other Muslim inmates were still allowed to pray when appropriate supervision was available, and when the Muslim Chaplain position was vacant, the State Chaplains of other faiths at PVSP were responsible for supervising Islamic prayer services and accommodating other needs of Muslim inmates. With regard to the third <u>Turner</u> factor, the impact of accommodating Plaintiff with an imam during the hiring and budget freeze is obviously excessive given the prison resources in general. Simply stated, PVSP did not have the funds to hire a imam. Lastly, with regard to the fourth <u>Turner</u> factor, there were no easy and obvious alternatives. In fact, PVSP and Defendants provided what could be done to ameliorate the situation. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim for denial of a Muslim Chaplain.

2. <u>RLUIPA</u>

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, unless the burden furthers a compelling governmental interest, and does so by the least restrictive means." <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 712 (2005) (internal punctuation omitted) (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)). Religious exercise includes "any exercise of religion, whether or not compelled by or central to, a system of religious belief." <u>Cutter</u>, 544 U.S. at 715 (quoting 42 U.S.C. § 2000cc-5(7)(A)). In enacting RLUIPA, Congress replaced the "legitimate penological interest" standard with the " 'compelling governmental interest' and 'least restrictive means' tests codified at 42 U.S.C. § 2000cc–1(a)." <u>Warsoldier v. Woodford</u>, 418 F.3d 989, 994 (9th Cir. 2005).

///

Section 3 applies to state run institutions such as prisons.  Cutter, 544 U.S. at 722 (citing 42 U.S.C. § 2000cc-1(a)).  RLUIPA does not elevate accommodation of religion over an institutions need to maintain order and safety.  Cutter, 544 U.S. at 723.  In enacting RLUIPA, the legislature expected courts to apply the standards of RLUIPA with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  Cutter, 544 U.S. 709, 723 (2005) (citations omitted).

The inmate bears the initial burden of presenting evidence to demonstrate a prima facie claim that the conditions he is objecting to constitute a substantial burden on the exercise of his religious beliefs.  Warsoldier, 418 F.3d at 994.  If the inmate establishes the prima facie existence of a substantial burden on exercise of his religious beliefs, then the defendants bear the burden of proving that any substantial burden on the exercise of the inmate's religious beliefs is both in furtherance of a compelling governmental interest and the least restrictive means for furthering that compelling governmental interest.  Id. at 995.  RLUIPA is to be broadly construed in favor of protecting an inmate's right to exercise his religious beliefs.  Id.

"[A] 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise.  Warsoldier, 418 F.3d at 995 (quoting San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir.2004)).  The Supreme Court has also found a substantial burden "where the state denies an important benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs."  Warsoldier, 418 F.3d at 995 (quoting Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 717–18 (1981)).

In determining whether government action is lawful under RLUIPA the Court must consider: 1) whether Plaintiff has shown that his exercise of religion is at issue; 2) whether Plaintiff is asserting a sincerely held religious belief; 3) whether the state's conduct substantially burdens Plaintiff's religious exercise; and 4) if so, was the action taken in furtherance of a compelling government interest and was narrowly tailored to that interest.  Rouser v. White, 630 F.Supp.2d 1165, 1181-86 (E.D. Cal. 2009).

Plaintiff has sued Defendants individually and in their official capacities. (Fourth Am. Compl. at 2, 6.) The Ninth Circuit has held that "RLUIPA does not authorize suits for damages against state officials in their individual capacities because individual state officials are not recipients of federal funding and nothing in the statute suggests any congressional intent to hold them individually liable." Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir. 2015). RLUIPA only authorizes suits against a person in his or her official or governmental capacity. See Wood v. Yordy, 753 F.3d 899, 904 (9th Cir. 2014); see also Holley v. Cal. Dep't of Corrs., 599 F.3d 1108, 1111-14 (9th Cir. 2014) (defendants have Eleventh Amendment immunity from official capacity damages claims under RLUIPA).

Furthermore, although Plaintiff requests injunctive relief, his claims are moot because he is no longer incarcerated at PVSP. Article III, section 2 of the United States Constitution provides federal courts with jurisdiction over an actual case or controversy. U.S. Const. art. III, § 2. This case or controversy requirement exists throughout all stages of federal judicial proceedings, trial and appellate. Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477-78 (1990)). Accordingly, parties must continue to have a personal stake in the outcome of the lawsuit. Lewis, 494 U.S. at 477-78 (quoting Los Angeles v. Lyons, 461 U.S. 95, 101 (1983)); see also Preiser v. Newkirk, 422 U.S. 395, 401 (1975).

As previously stated herein, the allegations set forth in Plaintiff's fourth amended complaint took place from 2009 to 2011, while he was housed at PVSP. (Fourth Am. Compl. at 10-21.) When Plaintiff filed his original complaint in this action, he was incarcerated at PVSP. However, on January 26, 2011, Plaintiff filed a notice of change of address indicating a transfer to the Richard J. Donovan Correctional Facility in San Diego, California. (ECF No. 19.) Plaintiff filed another notice of change of address on March 2, 2011, confirming his transfer to Richard J. Donovan Correctional Facility. (ECF No. 20.) Plaintiff filed a subsequent notice of change of address on May 28, 2013, again confirming housing at the Richard J. Donovan Correctional Facility. (ECF No. 43.) Most recently, on April 27, 2015, Plaintiff filed a notice of change of address indicating that he was transferred to Salinas Valley State Prison, where he is currently incarcerated. (ECF No. 90.) Thus, it is apparent that Plaintiff is no longer subject to the alleged unlawful conditions he complains of at PVSP. See

34

Winstein v. Bradford, 423 U.S. 147, 149 (1975); Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir. 2015) (inmate's RLUIPA claims for injunctive relief was moot because "[o]nce an inmate is removed from the environment in which he is subjected to the challenged policy or practice, absence a claim for damages, he no longer has a legally cognizable interest in a judicial decision on the merits of his claim.") (quoting Alvarez v. Hill, 667 F.3d 1061, 1064 (9th Cir. 2012)). Nor do Plaintiff's claims fall within the "capable of repetition, yet evading review" exception to the mootness doctrine. See Williams v. Alioto, 549 F.2d 136, 143 (9th Cir. 1977) ("A mere speculative possibility of repetition is not sufficient. There must be a cognizable danger, a reasonable expectation, of recurrence for the repetition branch of the mootness exception to be satisfied."). The "capable of repetition, yet evading review" exception to the mootness doctrine is applicable "where two elements combin[e]: (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." Weinstein v. Bradford, 423 U.S. at 149. Here, the challenged policy was not too short in duration to be fully litigated before cessation, and even if so, given Plaintiff's transfer from PVSP in 2011, he cannot reasonably expect that he will be subject to the PVSP policy again and Plaintiff has not demonstrated otherwise. Accordingly, Plaintiff's RLUIPA claim for injunctive relief should be dismissed as moot.

       3.    Equal Protection

Plaintiff alleges an Equal Protection Clause claim against Defendant McGee (Protestant Chaplain).

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982)). A prisoner is entitled "to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" Shakur v. Schriro, 514 F.3d 878, 891 (9th Cir. 2008) (quoting Cruz v. Beto, 405 U.S. 319, 321-22 (1972) (per curiam)). To state a claim, a plaintiff must allege facts sufficient to support the claim that prison officials intentionally discriminated against him on the basis of his religion by failing to provide him a reasonable opportunity to pursue his faith compared to other

similarly situated religious groups.  Cruz, 405 U.S. at 321-22; Shakur, 514 F.3d at 891; Serrano v. Francis, 345 F.3d 1071, 1082 (9th Cir. 2003); Lee v. City of Los Angeles, 250 F.3d 668, 686 (9th Cir. 2001); Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997), overruled in part on other grounds by Shakur, 514 F.3d at 884-85.  However, the Equal Protection Clause does not require "that all prisoners must receive identical treatment and resources."  Hartmann v. California Dep't of Corr. & Rehab., 707 F.3d 1114, 1123 (9th Cir. 2013).

Defendant McGee declares that because there were only two prison chaplains after December 2008, and because there was an excessive workload, he (McGee) and Catholic Chaplain could not supervise chapel service for every religious group.  (Decl. of McGee, ¶¶ 10, 15, 38, 39.)  To reasonably accommodate all religious groups, the two Chaplains supervised as many other religious groups' services as possible.  (Id.)  McGee and the other chaplain became responsible for overseeing approximately fourteen different religious groups on five facilities at PVSP, and provided a wide range of services in addition to chapel service supervision.  (Decl. of McGee, ¶ 16.)  McGee declares that he frequently supervised Muslim and other (non-Protestant) religious groups' chapel services, and never showed preference or favoritism to any religious group in doing so.  (Decl. of McGee, ¶¶ 40-41.)

It is undisputed that during the hiring freeze, PVSP was severely limited as to what positions could be filled: certain security positions were exempt from the freeze, where as non-security positions, such as the State Chaplain positions, were not.  (UDF 134.)  During the time period relevant to the fourth amended complaint, PVSP had submitted hiring freeze exemption requests for most of its vacant positions, including the vacant Muslim Chaplain position, but these were frequently denied. (UDF 135.)  PVSP staff notified Islamic mosques in Fresno and Oakland of the job opening, and also asked them to provide volunteers to supervise religious services.  As of May 2010, there were no applicants on file at PVSP.  (UDF 136.)  Thus, PVSP staff made efforts to secure volunteers to supervise Muslim services.  (Decl. of W. Myers, ¶¶ 47-48, 100.)  The hiring freeze persisted through January 18, 2012, the date when PVSP received a hiring freeze exemption from CDCR Headquarters. (UDF 138.)  The next Muslim Chaplain, Chaplain Johnson, was hired in May 2012.  (UDF 148.)

36

Given the declaration by Defendant McGee and Plaintiff's failure to dispute such factual contentions, there is no genuine dispute of material fact as to whether McGee treated Plaintiff differently than other inmates and their faiths. Nor is there a genuine dispute whether McGee acted with the intent to discriminate against Plaintiff because of his Muslim faith. Plaintiff's generalized allegations in his complaint that Muslim inmates were treated worse than those of other religions is not sufficient to raise a triable issue of fact. See, e.g., Washington v. Davis, 426 U.S. 229, 239 (1976) (disproportionate impact alone does not establish discriminatory purpose). Furthermore, any different treatment of Plaintiff was reasonably related to legitimate penological interests. While it is unfortunate that PVSP lost Muslim Chaplain Salaam in December 2008 and were not able to replace Chaplain for several years, the fact remains that prison officials and Defendants attempted to curtail any infringement on Plaintiff's and other Muslim inmates faith. As stated above, chapel access and other religious exercise restrictions at PVSP were based on prison safety and security issues, during a time of significant budget constraints. Plaintiff has simply failed to meet his burden in demonstrating that any action or inaction by Defendant McGee was discriminatory as between faiths, and Defendant McGee is entitled to summary judgment on this claim. Furthermore, even if the Muslim inmates were subjected to worse treatment than other inmates as a result of the lack of Muslim Chaplain, such factor passes muster under the Turner test for the reasons explained above. Accordingly, Defendant McGee is entitled to summary judgment on Plaintiff's Equal Protection Clause claim.[7]

## V.

## RECOMMENDATIONS

Based on the foregoing, Defendants' motion for summary judgment should be granted in its entirety as to all Defendants and judgment should be entered in their favor.[8]

---

[7] Because the Court has determined in its review of Plaintiff's claim on the merits that no constitutional right has been violated based on the allegations and facts established on the record, there is no reason to further analyze or address the issue of qualified immunity. Saucier v. Katz, 533 U.S. 194, 201 (2001).

[8] Although the successor in interest, Shannon Lantz, to deceased Defendant Seth Lantz has not yet appeared, summary judgment may be granted in her favor on the basis of the facts presented by Defendants because all Defendants are in the similar position as to Plaintiff's claims against them. See Columbia Steel Fabricators v. Ahistrom Recovery, 44 F.3d 800, 802-03 (9th Cir. 1995) (affirming grant of summary judgment in favor of nonappearing defendant where plaintiff, in response to summary judgment motion filed by defendant who had appeared, had "full and fair opportunity to brief and

Accordingly, it is HEREBY RECOMMENDED that:

1.      Defendants' motion for summary judgment be granted; and

2.      The Clerk of Court be directed to enter judgment in favor of Defendants.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  Wilkerson v. Wheeler, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).


IT IS SO ORDERED.

Dated:   **August 15, 2017**

UNITED STATES MAGISTRATE JUDGE

present evidence" on dispositive issue as to claim against nonappearing defendant); see also Abagninin v. AMVAC Chemical Corp., 545 F.3d 733, 742 (9th Cir. 2008) (holding district court property granted motion for judgment on the pleadings as to unserved defendants where such defendants were in a position similar to served defendants against whom claim for relief could not be stated).